No. 13,813.

E. B. WILLIAMS & CO. VS. LOUISIANA LUMBER CO.

SYLLABUS.

ON MOTION TO DISSOLVE THE ATTACHMENT.

Although one sues out a writ of attachment for a larger amount than he is enti-
tled to, he may yet sustain the attachment for the amount to which the testi-
mony on trial shows he is entitled.

ON THE MERITS.

The special plea of defendant was not so worded as to limit the defense to the one
ground raised: that lumber, which was the consideration of the violated con-
tract, had declined in value.

The defendant's agent had at first made representation regarding the percentage
of the first and second clears; afterwards, this agent declined to guarantee
the amount of the percentage. Plaintiff, in view of the circumstances, has no
ground upon which to base an argument of false representation and warranty
of percentage of measurement of the upper grades of the lumber.

The percentage of clears is increased from fifteen to twenty-five per cent. of the
lot of lumber sold by defendant to plaintiff. Four dollars a thousand was the
extent of the profits shown which plaintiff would have made at the place of
destination.

APPEAL from the First Judicial District, Parish of Caddo—
Land, J.

*Sutherlin & Hall* and *Scarborough & Carver* for Plaintiffs, Appel-
lants.

*Alexander & Wilkinson* and *George Whitfield Jack* for Defendants,
Appellees.

The opinion of the court was delivered by

BREAUX, J. Plaintiff's action is for damages. It is a wholesale
lumber dealer, manufacturer, and exporter in New Orleans. The
amount of the claim is fifteen thousand three hundred dollars for the
violation of a contract. A writ of attachment was issued for part of
this claim, eight thousand seven hundred and three dollars, for items
which plaintiff avers were certain as to amount due. But items for
asserted injury to credit, loss of time; and others similar were omitted.

Plaintiff alleged that defendant is a non-resident corporation, a fact not disputed. Plaintiff, under garnishment process, seized the judgment which defendant had obtained in Barr and Hetterman vs. Henderson in the District Court and which is now pending on appeal in the Supreme Court.

It is admitted by defendant that he bound himself to deliver to plaintiff two million feet of cotton-wood lumber on yard opposite the City of Shreveport on Red river in Bossier Parish, grades clear, common, and culls (mill culls and mis-sawed excluded). The clear grades were to be delivered in New Orleans for export at sixteen dollars and fifty cents per thousand and the common and culls were to be delivered at St. Louis for fifteen 75-100 dollars. This was also alleged, in substance, by plaintiff. Plaintiff avers that defendant failed to deliver the number of feet of lumber promised of the upper grades on which he expected a larger profit than he thought of realizing on the lower grades.

He also avers that defendant failed to comply with the promise he had made to re-saw the mis-sawed lumber and that, in consequence of this failure and the failure to deliver the lumber timely, he was greatly damaged.

Defendant contradicts plaintiff's contentions for damages and denies that he was damaged at all, or, if damaged, that the damage was due in any manner to his default. Taking the case as a whole, defendant admits that he did not deliver the lumber sold, and shows that he, defendant, also met with disappointment in not obtaining the delivery of the lumber which he had previously bought from Henderson.

### Motion to Dissolve the Attachment.

Defendant, in its brief on appeal, limits its ground to dissolve to the following, and, as we take it, has abandoned its other ground. The ground urged is that it was impossible for plaintiff to swear accurately to the amount due. In support of this ground, defendant urges that the amount of the judgment of the District Court was so much less than the amount of plaintiff's claim, that if this court affirms the judgment, the attachment should be dissolved, as it would be evident that plaintiff was greatly mistaken in its affidavit.

If one, in good faith, sues for the violation of a contract and claims a larger amount than is afterward decreed by the court to be due, the

accompanying attachment should be held good for the amount so decreed as due. The mere fact that plaintiff claimed too much, if claimed in good faith, is not to be taken as ground sufficient to dissolve the attachment and perhaps prevent him from recovering the claim due. It was not possible for plaintiff to swear accurately enough from his point of view. The evidence sustains his claim to part, and to that extent, the attachment is sustained.

## On the Merits.

Plaintiff, in the first place, contends that defendant should not have been permitted by the District Court to abandon its special defense "that lumber had declined in value," and to take up the inconsistent defense that the percentage of clear grades was less than claimed. Arguing in support of this position, plaintiff points to the fact that objection was made before any evidence was received, on the ground that defendant did not allege that the lumber was of a grade lower than commercial, and that by the evidence introduced, defendant raised issues not alleged.

In our view, the defendant, as relates to the issue now in hand for decision, did not go beyond the limits of the pleading, nor is the evidence in conflict with defendant's special plea. Plaintiff, in substance, claimed that his profits would have been larger on the upper than on the lower grades of lumber, if defendant had complied with the contract. The interpretation of the contract rendered it necessary to admit testimony regarding the grades of lumber. The special plea invoked by plaintiff on this point was not of such a nature as to preclude all possibility of admitting the testimony. Defendant specially denies all responsibility, and, in thus denying, puts at issue plaintiff's action on the contract, setting forth the different grades of lumber. It follows that defendant's demand in this respect was, by the effect of the allegations, sufficiently made known to plaintiff.

The other objections, viz: that the contract called for lumber, which means average lumber, will be taken up later on.

This brings us to plaintiff's next ground, that defendant is bound in warranty as to quality as well as to title, and that, in consequence, defendant, in selling the lumber for a sound price, bound itself to sell and deliver a sound article. We have seen that plaintiff's contention is that they would have made a profit of twenty-five cents per thousand on the

common and culls and five dollars per thousand on the firsts and seconds; and warranty of the contract is invoked in support of the position that a certain number of feet of the first and seconds should have been delivered, and that, altogether, a better grade of lumber was sold than defendant admits.

The warranty as to the number of feet sold and the quality sold as claimed by plaintiff, and the asserted representations of the defendant, give rise to an issue of facts. Defendant, in answer to an inquiry for lumber made by plaintiff in February, 1900, stated that it had for sale "some two million feet of cotton-wood, all log run and sawed, four by four full," and to this, plaintiff's answer was that they had not been buying cotton-wood and were not familiar with the transportation facilities, but that they were willing to depart from their usual line of purchase and to buy one million feet of cotton-wood lumber, log run, mill culls out, to be cut in sizes of one and a quarter by one and a half inches and defendant to guarantee sixty per cent. firsts and seconds.

In another letter, dated February 24th, 1900, the plaintiff states that, not knowing the quality of defendant's output of lumber, nor of the logs sawed by it, it assumed that the first and second grades would average at least forty per cent. Further on, in the same letter, plaintiff wrote: "It is utterly impossible for us to pay $12.50 per M. feet B. M. for your lumber, unless you can guarantee us a large percentage of firsts and seconds." About this time, in their dispatches, plaintiff insisted upon a guarantee by defendant of a certain percentage. Early in March, 1900, defendant, replying to plaintiff, expressed it as its opinion, that the lumber was of the grades that plaintiff desired, but expressly stated that it was unwilling to guarantee the grades. The next day, without the least reference to a guarantee regarding grades, which we understand defendant declined to give, plaintiff, in a letter from New Orleans, its place of business, to the defendant, at Shreveport, requested an option of five days within which to accept defendant's offer. The option was secured and defendant was informed by letter that plaintiff was exerting itself to close a deal with one of its customers for this lumber within the option limit; that it had no market for common and culls, but that it would exert itself to sell these grades, and then it would accept the offer. It stated, further, that it would not handle mill culls. This was on the tenth of the month; on the twelfth, one of the partners of the plaintiff firm, who had gone to Shreveport, sent a telegram to his firm wanting to know if it would

complete the purchase of seven hundred thousand clears, common and culls, but that he had excluded from the defendant's proposal the mill culls and the mis-sawed lumber. The firm accepted the offer. One of the members of the plaintiff firm made an inspection of the lumber on defendant's yard, or, as he had expressed it, had taken a view of the lumber, but he testifies that an authorized agent of the defendant represented to him that about forty per cent. of the lumber was first and second grades, and this agent's estimate of the lumber on the yard was in excess of two million feet, and that upon these representations he consented to buy the first and second grades and the common and shipping culls, subject to the approval of his firm. He says that, together, they estimated that the first and second grades would amount to about 800,000 feet; that he wrote out a telegram of the proposition, which he read to the agent and to which this agent assented. The mis-sawed lumber and the mill culls on the yard were expressly left out of the deal. He mentioned in this telegram that the clears (*i. e.,* the firsts and seconds) would measure 700,000, making it less than the defendant's agent estimated, which was 800,000 feet, but he desired to be conservative.

This plaintiff also testifies that defendant's agent bound the defendant to re-saw the lumber that had been mis-sawed and that from this mis-sawed lumber he expected to increase the percentage of the upper grades. With reference to re-sawing, plaintiff wrote: "We are of the opinion that it will be greatly to your advantage to exercise great care in the re-sawing of this lumber as it will add very materially to the result of the first and second grades." To this defendant answered, agreeing with the plaintiff. After this, plaintiff sent an inspector to inspect the lumber defendant was to deliver and his report was unfavorable. While on the ground, he telegraphed to plaintiff not to accept the offer, but plaintiff did not choose to follow out the suggestion and accepted the lumber.

This witness admits that the defendant offered to sell him "log run," without reference to grade. He insists that he did not accept the offer. This witness virtually acknowledges that defendant, in its letters to his firm, positively refused to guarantee any percentage of first and second grades, but says that this correspondence occurred considerably prior to the date of the deal, and adds, while being cross-examined, that defendant made no guarantee in regard to firsts and seconds. This witness testified: "I said that we asked no guarantee, and I do not presume that he would volunteer a guarantee."

Defendant's agent flatly denies that he had ever made any estimate of the first and second grades, and also denied that he had ever offered any guarantee to plaintiff of percentage of grades. The direct contradiction between these two witnesses rendered it necessary to look elsewhere in the record for proof. Weighing other evidence upon the subject, we have arrived at the conclusion that the plaintiff, had the lumber been delivered, would have had to accept the different grades and to pay for the number of feet of each delivered. The defendant had refused to guarantee any particular percentage of any grade and, after the refusal, plaintiff bought the lumber. The refusal to guarantee the percentage was ample notice that defendant did not intend to sell by lot, but only after measurement of the lumber.

We take the following as proof that plaintiff was to pay for the grades it got: "Terms of sale were cash for lumber as delivered, inspection at mill, shipment to consignee no later than April 20th, 1900."

Having found that the plaintiff bought the lumber without warranty or representation enabling him to recover percentage claimed of the upper grades, we pass to the question of the amount of clears or first and seconds there was in the two million feet bought. The amount of lumber in these grades is important, for we understand that plaintiff looked on these for a considerable profit.

The judge of the District Court arrived at the conclusion that such grades amounted to fifteen per cent., or 300,000 feet. We are informed by the testimony that in the sawing of cotton-wood logs into lumber, fair percentage, a good average, would be forty per cent. of the log run. Log run is considered the full product of the log and denotes all the different grades manufactured in the sawing of the logs. Commons and culls, taken together, should run from forty to sixty per cent. of the log run. We may as well state that the grades are box boards, firsts, seconds, commons, and culls. The remainder is considered as being worthless for lumber, being mill culls and refuse or waste. Quality and the dimensions of the lumber are to be considered in grading. It appears that it is very exceptional to re-saw commons and culls so as to make first and second' clears. The dog board, that is the last board cut from the log, is usually of uneven thickness and is usually worthless unless re-sawed by the re-sawing machine.

The manufacture at the defendant's mill, for different causes, was not, it appears, up to the standard. The inspector who was sent by

plaintiff testified that the lumber on the yard, bought by them, was the most worthless he had ever seen; that it would have cost more to re-saw the mis-sawed lumber on this yard than it was worth. This and other testimony sustain only a low estimate of percentage of clears. The lumber was mostly of inferior grades, it is true, yet there surely was some of it of the upper grades. Although defendant declined to guarantee, the percentage was not slow in giving rise at least to the hope, on the part of the defendant, that much of the lumber on the yard was of the better grades.

The difference between estimates is usually extreme and it is particularly so in this case. It varies from two to sixty per cent. Some of the witnesses have testified that the percentage of the better grades was as low as two per cent. and others as high as sixty per cent. It does not appear that any account of stock was ever taken of the lumber on the yard or careful inspection made. After weighing the testimony and seeking to ascertain the average of this lumber at the time, as made to appear by the preponderance of evidence, we think it can safely be put at twenty-five per cent of the lot sold, i. e., 500,000 feet. We include in this the increase of value which the promised re-sawing would have given.

The next point raised relates to the market value of the lumber at the point of destination and the consequent damages for non-delivery in order to enable plaintiff to carry out its own contract with its customers. We have seen that the firsts and seconds were sold at $16.50 per thousand, to be delivered at the port of New Orleans, and the common and shipping cull at St. Louis for $15.75 per thousand, f. o. b. at these respective places. We take it that the profit on the latter grades was quite limited, if anything. Our brother of the District Court stated, in a carefully written opinion, that he did not think that the plaintiff was entitled to anything on the commons and culls, for the reason that, in his view, it was made evident that if the lumber had been delivered, as defendant had bound himself to do, the plaintiff would not have made any profit thereon. The average price abroad for the first and second grades, plaintiff informs, us, was about thirty dollars per thousand B. M. The ocean freight averaged eight dollars and fifty cents per thousand B. M., leaving the value of the lumber f. o. b. New Orleans, La., twenty-one dollars and fifty cents per thousand feet B. M.

We left the evidence on this point not convinced that, for the

material which plaintiff bought, he would have obtained that much per thousand from his foreign customers. There is testimony that cottonwood lumber was worth twenty dollars and fifty cents at ship side in New Orleans at the time. This was accepted as a fair price by the District Court, and we agree with the view, that is, that the lumber in question was worth four dollars profit in New Orleans.

We have given consideration to the other items of damage and have not found good reason for allowing them any further than they may enter into and be considered as rendering it absolutely certain that plaintiff is entitled to the damages here allowed.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be increased from twelve hundred dollars to two thousand dollars, with legal interest thereon from May 31st, 1900, until paid, and costs, and that after amendment by thus increasing the amount, the judgment is affirmed.

It is further ordered, adjudged, and decreed that the writ of attachment is maintained for the total of the judgment allowed, and that plaintiff's privilege as attaching creditor be recognized and enforced according to law. It is further ordered, adjudged and decreed that plaintiff have judgment against Henderson, garnishee, for the sum of two thousand dollars with interest and costs.

The costs of appeal to be taxed on the defendant and appellee.

Rehearing refused.